IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA STATESBORO DIVISION

FILED
U.S. DISTRICT COURT
BRUNSWICK DIV.
2013 DEC 30 P 4: 18
D. Taylor
GA.

BRAJA PANDIT SMITH
PLAINTIFF

V.

BRIAN OWENS; ROBERT TOOLE;
JOHN PAUL; WINDELL FOWLER
LARRY BRUTON; TERRY NOYETT;
COII JENKINS; COI BISHOP; COII
TOOTLE; COII/CERT DOMINGEZ;
COII BLAKENLY; COII ANDERSON;
COII TAYLOR; COI OSBOURNE;
COI CLEMENS, Corrections officials
At Georgia State Prison, individually
and in their official capacities,
DEFENDANTS.

Civil Action No.
COMPLAINT

CV613-115

## I. JURISDICTION AND VENUE

1. This is a civil action authorized by 42 U.S.C. Section 1983 to redress the deprivation, under color of state law, of rights secured by the Constitution of the United States. The court has jurisdiction under 28 U.S.C. Section 1331 and 1343 (a)(3). Plaintiff Smith seeks declaratory relief pursuant to 28 U.S.C. Section 2201 and 2202. Plaintiff's Smith claims for injunctive relief are authorized by 28 U.S.C. Section 2283 and 2284 and Rule 65 of the Federal Rules of Civil Procedure.

2. The Southern District of Georgia is an appropriate venue under 28 U.S.C. Section 1391(b)(2) because it is where the events giving rise to this claim occurred.

## II. PLAINTIFFS

3. Plaintiff BRAJA PANDIT SMITH, is and at all times mentioned herein a prisoner of the State of Georgia in the custody of the Georgia Department of Corrections. He is currently confined in Georgia State Prison, in Reidsville, Georgia.

## III. DEFENDANTS

4. Defendant, Brian Owens is the Commissioner of the State of Georgia Department of Corrections. He is legally responsible for the overall operation of the Department and each institution under its jurisdiction including Georgia State Prison.

5. Defendant, Robert Toole is the Warden of Georgia State Prison. He is legally responsible for the operation of Georgia State Prison as well as the welfare of all inmates in Georgia State Prison.

1.

6. Defendant, John Paul is the Warden of Security of Georgia State Prison. He is legally responsible for security operations as well as the general safety measures and policies concerning all inmates at Georgia State Prison.

7. Defendant, Windell Fowler is the Warden of Care and Treatment of Georgia State Prison. He is legally responsible for all operations concerning the care and treatment of all inmates at Georgia State Prison.

8. Defendant, Larry Bruton is the Unit Manager of Georgia State Prison. He is legally responsible for the operations of B-Unit at Georgia State Prison.

9. Defendant, Jenkins is a Correctional Officer of the Georgia Department of Corrections who, at all times mentioned in this complaint, held the rank of COII and was assigned to Georgia State Prison.

10. Defendant, Bishop is a Correctional Officer of the Georgia Department of Corrections who, at all times mentioned in this complaint, held the rank of COI and was assigned to Georgia State Prison.

11. Defendant, Tootle is a Correctional Officer of the Georgia Department of Corrections who, at all times mentioned in this complaint, held the rank of COII and was assigned to Georgia State Prison.

12. Defendant, Dominguez is a Correctional Officer of the Georgia Department of Corrections who, at all times mentioned in this complaint, held the rank of Cert/COII and was assigned to Georgia State Prison.

13. Defendant, Blakenly is a Correctional Officer of the Georgia Department of Corrections who, at all times mentioned in this complaint, held the rank of COI and was assigned to Georgia State Prison.

14. Defendant, Anderson is a Correctional Officer of the Georgia Department of Corrections who, at all times mentioned in this complaint, held the rank of COI and was assigned to Georgia State Prison.

15. Defendant, Terry Moyett is a Correctional Officer of the Georgia Department of Corrections who, at all times mentioned in this complaint, held the rank of Lieutenant and was assigned to Georgia State Prison.

16. Defendant, Clemens is a Correctional Officer of the Georgia Department of Corrections who, at all times mentioned in this complaint, held the rank of COI and was assigned to Georgia State Prison.

17. Defendant, Taylor is a Correctional Officer of the Georgia Department of Corrections who, at all times mentioned in this complaint, held the rank of COII and was assigned to Georgia State Prison.

18. Defendant, Osbourne is a Correctional Officer of the Georgia Department of Corrections who, at all times mentioned in this complaint, held the rank of COI and was assigned to Georgia State Prison.

## III. FACTS

19. At all times relevant to this case, Plaintiff Braja P. Smith has been on maximum security and supermax administrative segregation in B-Unit.

20. The conditions at GSP are so harsh they clearly constitute a violation of the Eighth Amendment.

21. Living quarters, food, medical care and especially safety is inadequate.

## LIVING CONDITIONS

22. The majority of close security inmates as well as a small percentage of medium security inmates at GSP are currently being housed in maximum security single man cells with a cellmate on 24 hour administrative segregation. Due to this policy developed by the Georgia Department of Corrections and carried out through the Commission's directive by GSP administration countless assaults, stabbings, robberies, extortions, rapes, suicide attempts, and even murders continue to threaten all inmates housed under these extreme conditions.

23. Because inmates being held at GSP on admin/seg. are not maximum or high maximum security they are undergoing unjustified torture by being forced to live in a cell designed to house a single maximum security or high-maximum security prisoner, with a roommate.

24. All cells at GSP are designed to house max/highmax prisoners. In 2007 all max/high max prisoners were transferred to Jackson State Prison where a new high max facility was built. By 2009 all max and highmax prisoners were at JSP and GSP's security level was lowered to minimum, medium, close.

25. Plaintiff Smith is a close security prisoner who was transferred to GSP from Baldwin State Prison in May 2012. BSP is also a minimum, medium, close security prison. At BSP all inmates are general population meaning they have the privilege of participating in normal prison activities.

26. Since Plaintiff Smith arrived at GSP he was immediately placed on admin/seg. and has remained so until this day.

27. Plaintiff has filed two civil actions concerning admin/seg and denial of religious freedom of which both were dismissed and plaintiff being on admin/seg. could not properly research the legal materials needed to challenge or appeal the court's decision. (see exhibits 22-25b)

28. Since then plaintiff has been the target of abuse and mistreatment by the administration.

29. Plaintiff has been denied parole twice due to his civil actions and his inability to take classes that are required by the parole board because he is on admin/seg.

30. Because inmates at GSP are not max or high max as soon as they are transferred to any other prison in Georgia they are immediately placed in population. This fact alone proves that the practice of holding inmates on indefinite admin/seg. at GSP is not legal or documented in state policys.

31. Because all cells at GSP are built for max and high max prisoner they are very restrictive and are the only cells designed like this in the state besides the high max facility at Jackson State Prison.

32. To make matters even worse between 2011-2013 the already harsh cells have been further altered per warden's Bruce Chatman, who has recently been replaced by Robert Toole, John Paul, + Windell Fowler.

33. The cells now are more harsh then they were when GSP housed the most dangerous prisoners in Georgia. They are even harsher then the high max cells at Jackson State Prison even though no one at GSP is max or high max.

34. Prisoners on admin/seg. in most cases are forced to live in a one man maximum security cell 24 hours a day with violent cellmates. The cell doors are only opened to escort inmates to call outs, yard, showers, transfers and visitation. The window on the door has recently been covered by a steel sliding plate on the outside of the cell to prevent prisoners from seeing into the unit.

35. There is a tray flap in the center of the door used to feed inmates as well as distribute supplies. This same flap is used for inmates to throw trash from and dirty laundry.

36. In most buildings housing admin/seg steel boxes have recently been welded to the cell doors to use for food, chemicals, supplies, laundry as well as cleaning supplies and trash. This was done to prevent guards from having to open the top tray flap which is now only used to handcuff prisoners.

37. These boxes are very unsanitary and are hardly if ever cleaned.

38. Steel plates have also been welded to the bottom of the cell doors to prevent prisoners from seeing under the door as well. This has cause the already poor air circulation to become worse.

39. Since warden Toole came, the light controls, toilet controls and electrical sockets have been removed from the cell. Prisoners now have to rely on the mercy of the guards to turn their lights on or off and even to flush urine and feces from their toilets. Radio's, Cd players, and shaving devices as well as fans sold to prisoners at inflated rates are now useless to prisoners on admin/seg. at GSP.

## A-UNIT

40. A-Unit consist of buildings A, dorms 1-4, B, dorms 1-4, C, dorms 1-4 as well as dorms E-1 and E-2. Dorm's C-1, C-2, E-1 and E-2 are designated the "honor dorms" or "privilege dorms". Inmates in these dorms are free to roam the tiers, dorm, yard and compound from 6am – 11:30pm at which time they are locked in their cells for the night. Being general population they are allowed to watch t.v. go to the gymnasium, library, barber shop, chowhall or cafeteria, attend religous services, attend classes, go to work assignments and interact with staff and fellow prisoners. Special privileges include flat screen televisions, micro wave ovens, games and single man cells. The vast majority of these "honor dorm" inmates are known informants or "snitches", homosexuals and caucasians.

41. These inmates along with the rest of general population still have control over their light controls, toilet buttons. They also have access to electrical sockets in their cells nor do their cells have any of the added security restrictions placed on cells in admin/seg.

42. Buildings A, B, as well as dorms C-3 and C-4 are A-Unit general population. The only difference from the honor dorms is they have two men cells and lack the special features such as flat screen tv.'s, micro wave ovens, and special games. Also these buildings don't have tiers but regular cell blocks.

43. Although the majority of A-Unit is minimum-medium security there are some close security in A-Unit as well.

## B-UNIT

44. B-Unit consist of buildings D-East, dorms 1-4, D-West, dorms 1-4, F, dorms 1-4, G, dorms 1-4, and K, dorms 1-4. General population in B-Unit is minimum, medium and close security.

45. Since plaintiff filed a civil action 5% of the close security were let into general population but for the most part 95% of close security remain on admin/seg on max or high max 24 lockdown and the majority of them have cellmates.

4

46. The majority of general population in B-Unit are housed in F-1, F-2 and F-4. These inmates enjoy the same freedoms and privileges of A-Unit general population except in regards to work details.

47. Due to length of sentences or charges B-Unit prisoners are not allowed to work outside the prison gates.

48. D-EAST and D-WEST are Level III Mental Health dorms housing inmates with serious mental problems. D-EAst dorms 2 and 3 house mental health level III admin/seg and consist of 13 single man cells. These cells have no electrical sockets, light switches or toilet buttons. Steel sliders and boxes have also recently been added to the cells.

49. D-West-2 is "ACU" or "suicide watch" and houses inmates that are seriously mentally unstable, or suicidal. It also consist of 13 single man "hard cells" meaning maximum security cells which have recently been altered just like all admin/seg cells.

50. D-EAst-1, D-WEst-1, 3 and 4 are mental health level III population which consist of 13 single man cells. These cells have none of the added barriers that have been added to "hard cells". Light switches, toilet buttons as well as electrical sockets are in these cells.

51. D-East-1 is protective custody population and also has 13 normal single man cells.

52. D building's general population are restricted from normal general population but still enjoy all or most of the same privileges as general population. The only difference is all activities are done in D building for those inmates housed there.

53. Buildings G, dorms 1-4 and K, dorms 1-4 are Administrative Segregation as well as F-3 which is admin/seg. medical dorm. All these dorms contain max or high max "hard cells" except F-3 which contains 24 to 26 single man cells that still have electrical sockets, light + toilet controls.

54. Dorms E-3 and E-4 have also been made into maximum security admin/seg. cell houses.

55. Dorms G-1-4, E-3 and E-4 contain about 25-27 maximum security cells. Although these cells are only designed to house one maximum security prisoner another bunk was added and now two men are locked in those cells indefinately 24 hours a day.

56. To aggravate matters worse the cells were further altered and made into "hard cells" as described earlier.

57. K building, dorms 1-4 was designed for high max, these cells also have been made into hard cells the only difference between K-building and the dorms G-1-4, E-3+E-4 are that in K building inmates have single man cells. Also G,1-4 and E-3 and 4 can control their toilets still.

58. These buildings are heavily enfested with rats, mice, giant roaches, several species of spiders, ants, and other virus carring pest. (see exhibits 14, 26, 27, 28, 29 and 30) 1 and 2)

## FOOD

59. Inmates in general population or "gp" are fed in a dining hall assigned to each dorm. Monday

through Thursday all inmates including admin/seg are fed 3 meals a day. Friday through Sunday inmates are only fed breakfast and dinner.

60. General population inmates are fed breakfast from 5:30am to about 7am. Breakfast is served hot as it was meant to be and the portions are generous.

61. Lunch is served from 11:30am to about 1pm. Lunch is served hot on Mondays and Thursdays and cold Wensday and Tuesdays. Thursdays are the last lunch for the week Friday Saturday and Sunday as well as holidays inmates are not fed lunch at all.

62. Dinner is served hot from 4:30pm to about 6:30pm.

63. All meals are prepared at Rogers State Prison which is located about 2-3 miles down the road and shipped to GSP via food truck.

64. Because GSP was originally a max/highmax prison the administration chose to not build a functioning kitchen where max security prisoners had access to knives and other metal utensils.

65. Meals are prepared at GSP's H-building after being delivered by RSP and seperated into pans for population and divided on trays for lockdown units.

66. Inmates on admin/seg. are fed in their cells on trays which are transported to each dorm on carts pushed by population inmates.

67. These trays often are not served on time resulting in "hot trays" never being hot and cold beverages never being cold. In many cases beverages are not even served at all.

68. Where breakfast is served in population starting at 5:30am admin/seg inmates aren't fed until about 7:30am sometimes as late as 8:30am.

69. Lunch isn't served until about 1pm sometimes as late as 2:30pm.

70. Dinner isn't served until about 6:30 sometimes as late as 9:30pm.

71. Trays are often only half a meal or portion per orders from the administration.

72. Trays are often not properly cleaned and often have residue from previous meals on them. In many cases trays have been reused even after they have been contaminated with feces, urine, blood, semen or chemical agents.

73. As a adhearant to the Hindu faith, plaintiff has requested on several occassions to be allowed to participate in the Alternative Entrée Meal Plan which is funded under the "Religous Land Use and Institutionalized Persons Act" (RLUIPA). Plaintiff's religous principle restrict him from eating any meat, poultry, fish or eggs or any meals prepared with animal by products besides dairy which does not require the slaughter or stop the developement of the animal.

74. According to the (RLUIPA) prisons cannot deny inmates the neccessary accommodations to engage in activities for the practice of their own religous beliefs. The Alternative Entrée Meal Plan is funded by the federal government provides free vegan meals to all inmates that qualify based on religous beliefs per S.O.P. IV01-0027.

75. Because GSP does not offer this program policy states that inmate's who meet the requirements but are at a prison that doesn't have the program will be put on a transfer list pending bed space at a prison that does offer the program.

76. Although plaintiff meets the vegan requirements he has been denied several times at the administrative level by John Paul due to personal dislike of the plaintiff.
77. Because of his decision plaintiff's ability to adhere to his strict religious principles are being denied.
78. Plaintiff filed a grievance and was again denied in which he appealed and was told if he wished to participate in a vegan meal plan he would have to pay for it.
79. Due to legal fee's plaintiff is indigent and is unable to afford to pay for his meals.
80. Because of my history of filing grievances and civil actions I have become a target of harrassment by the administration. (see exhibits 15, 19, and 20)

## MEDICAL

81. Medical and Mental Health needs are not being met in an adequate or timely fashion, especially true for inmates on admin/seg. Medical call outs are often respond to with "you will be seen" yet many inmates on admin/seg. are not seen at all. Serious injuries caused by abusive guards or negligent guards are often not seen by doctors and made to look minor in over to cover administrative wrong doing. Records and photo's of injuries are often made to disappear or are lost when requested by investigators.
82. Dental is also very indifferent to inmates request for service. Most dental request are not seen and those that are seen have to wait months to be seen. Plaintiff has requested to be seen for dental needs on several occassions for several issues but has only been seen once since he has been here. (see exhibits 14, 26, 27, 28, 29 and 30)
83. Mental health inmates suffering from serious mental issues are forced to undergo severe torture in order to be seen. To discourage inmates from seeking help inmates are stripped naked, given tissue paper gowns and placed in a strip cell with not even a mattress or blanket for days at a time. Plaintiff has undergone this treatment on more then one occassion for as many a 6 days. Windows and vents steadily pull in outside air even in the winter.
84. Plaintiff has suffered mental and emotional anguish due to the extremely harsh conditions he has been forced to endure at GSP.
85. After complaining to mental health doctors and counselors that he could not tolerate having to share a maximum security one man cell with any gang members after he was attacked at Baldwin State Prison October 2011 by 5 gangmembers.
86. This incident will clearly show any layman that being locked in a cell 24 hours a day with a violent gangmember will likely result in violence.
87. Mental health officials told plaintiff Larry Bruton controls placements and it was out of their control.
88. After several self injuries in order to escape two man max lockdown with gangmembers I was sent back to G-4 where I was stabbed in the chest by my cellmate who was a gang member, who had a record for stabbing people.

7.

## Guard Harassment and Brutality

89. Guard harassment, provocation and brutality is an everyday occurance at GSP especially for inmates in admin/seg. Defendant's Robert Toole, John Paul, Windell Fowler and Larry Bruton actually encourage this abusive behavior by allowing these guards to continue mistreating inmates. Denying inmates on admin/seg. yard call (outside recreation), law library, showers, trays, clothing, supplies, unneccessary repeated strip searches, taking authorized property and neglecting to proform basic duties. Guards commonly use excessive force to control and intimidate inmates. Although these complaints have been brought to the attention of the wardens and officials with high rank this problem still exist. Due to my, the plaintiff's history of filing grievances and civil action's he has been targeted continuously.

90. Because this practice of abuse of authority is encouraged by defendant's in supervisory positions such as Brian Owens and the warden's and Unit manager at GSP the guards as well as the other staff have made it their duty to abuse inmates on a daily basis.

91. Plaintiff has been assaulted numerous times by guards (see exhibits

92. These excessively harsh conditions have caused the plaintiff physical pain as well as mental and emotional injury. (see exhibits 3-13, 16-18, 21, 30-33)

## Incidents

93. On 7-13-12 COII Jenkins used unnecessary excessive force when he forcibly snatched the phone out of my grasp as I attempted to use it. COII Jenkin's asked me for the phone which he had just gave to me. After I refused to give him the phone he became very angry and aggressive and began snatching on the phone very forcefully which is against policy. After snatching the phone out of my grasp through the steel tray flap and smashing my hand and finger in the steel flap he then secured the flap. My finger was left bleeding and severly swollen causing extreme pain. I requested to be taken to medical but Jenkins refused to call medical or notify his superior which is what he was supposed to do at first before attempting to use force. I had to wait until the next shift come on to be seen. After I informed the floor officer CoIRoss and showing him my injuries he immediatly notified his supervisor Sergent Evans who immediatly took me to medical where I was treated by nurse Morallis who cleaned my hand and placed my finger in a splint. I was given Motrin for pain. Pictures were taken and an incident report was made by Sgt. Evans. I was then placed back in my cell. No x-rays were taken nor was I seen by a doctor my finger remained swollen and bruised for two months in which I could not bend it. This incident was captured by K-2 digital camera covering cells 7-13 from 5-7pm. (see exhibit 8)

94. On 8-15-12 CoI Bishop used excessive force when he forcefully slammed my arm in the steel tray flap. After opening my cell door tray flap while passing out dinner trays I attempted to grab my tray and Bishop told me to back up or he wasn't going to feed

me or my cellmate. Because this order did not make since due to the fact that in order to get the tray I had to step up directly to the door and get the tray I refused to obey. Bishop then attempted to close the flap without feeding me or my cellmate but before he could I stuck my arm out the steel flap. Seeing my arm hanging out the flap he then began to repeatedly slam my arm in the door flap in order to cause me pain. After central control notified the supervisor Lt. Crapps me and my cellmate were taken to medical. Pictures were taken and I was given Motrin for pain. My arm stayed sore and bruised for a whole week. Officer Bishop told the Lt. that the reason he shut my arm in the flap was because I projected a liquid substance on him which there was no evidence of at all nor was a disciplinary report written. This incident was captured on digital camera in G-2 between 4-7 pm. I was then located in cell 24. (see exhibit 21)

95. On 8-13-12 CoII Tootle used her handcuffs to assault me by swinging them like a pair of nunchukas using enough force to split the skin open on my forearm causing it to bleed and swell. Actually in this incident it was my hand that was injured my forearm was injured in the same manor in another incident. Medical treatment was denied even after the supervisor Sgt. Hutchinson was notified of the attack. I refused to exit the shower until I was seen by medical and an incident report was made. Sgt. called the Cert Team or "goon squad" to forcefully extract me from my ~~cell and~~ shower and put me in my cell. Before they actually used their weapons against me Sgt. Tarver who was then only a Cert Team officer and a member of the Tactical Squad agreed to take pictures of the injuries. After pictures were taken I was placed in my cell. My hand remained swollen and in pain for at least 5 days. This incident should also have been captured on digital camera in G-2 shower cut between 6-10 am. (see exhibit 9)

* 96. On 8-17-12 at about 10 am Cert officer Domingez who was escorting admin/seg. inmates to the yard cages came to my shower and closed me in the shower by securing the steel flap that the floor officer had left open since he was coming to get me next out of the shower. Domingez, who has a tough guy attitude and is very aggressive and disrespectful of inmates, had no business closing my flap. I called him a "racist wetback" in response to his actions. He then asked the floor officer what cell I was in and entered my cell for several minutes. As I was being escorted back to my cell by CoII Tootle first I saw that several books, magazines and clothing items had been removed from my cell. As I attempted to enter my cell I was suddenly assaulted by a chemical agent commonly known as mace or pepper spray. I immediatly began coughing and backing out of in front of my cell. Unit Manager Larry Bruton just so happened to be walking into the dorm and noticed the commotion. He then told me to enter my cell. I told him that someone sprayed my cell down with mace. Larry Bruton did not believe me until he came near

* See exhibit 10

9.

my cell and was immediatly overwhelmed by the chemicals himself. Me along with my cellmate who was also in the shower while Domingez was in our cell were taken to the small holding cages in the back of the dorm and had to remain there for over 5 hours while the cell aired out. Medical treatment was denied. I suffered burning eyes skin and chest pains due to chemical exposure. This incident was captured on G-2 digital camera from 6am-4pm.

97. On 8·31·12 I was assaulted by CoII Blakenly when he used CoI Whitleys handcuffs like a pair of nunchukas and struck my forearm causing the skin to break swell and bleed. Officer Blakenly who was escorting Officer Whitley running showers became enraged after I failed to allow him to secure the flap without getting me a bar of soap since supplies had not been issued all that week and snapped on me. Again Sgt. Hutchinson who is known to abuse inmates refused medical treatment. I refused to exit the shower without being seen. The Cert Team was again called to force me to my cell. Cert Officer McCullen took pictures of my injuries and I was then put in my cell without a shower. My arm remained sore and bruised for about a week. This incident was captured on digital camera in G-4 between 6am to 8am. (see exhibit 11)

98. On 11·6·12 CoII Anderson used excessive force when he attacked me for no reason while he was escorting me back to my cell while in ACU or "suicide watch". After talking to the mental health doctor's about my issues I exited the office and was immediatly secured by Officer Anderson who grabbed me by the arm while I was handcuffed behind my back. As I was walking to my cell I noticed my paperwork lying in a pile of trash, it had been swept out of my cell while I was talking to the doctor. As I squated down to retrieve my papers which were actually only a disciplinary report I had recieved while on ACU status. Anderson violently yanked me back up by the cuffs causing them to cut into my wrist to the bone. On instinct I pulled away from him and backed up. He then punched me square in the mouth with all his strenght attempting to knock me out. After that didn't bring the desired results he then came at me with a flurry of punches which I dodged. He then grabbed me and attempted to dump me on my neck while I was in cuffs behind my back the entire time. Reaching from behind I grabbed him by his belt to keep from being thrown to the ground. This is when Luietenant Terry Moyett who had been witnessing the entire event came to his aid.

99. On 11·6·12 Lt. Terry Moyett after witnessing Officer Anderson attack me came to his aid and helped Anderson slam me on my side violently to the tiled floor. Once I was down Lt. Moyett climbed on top of me and grabbed me by my windpipe and began to choke me while glaring into my eyes and telling me to calm down. Before I passed out several other officers arrived with a camcorder and Lt. released his death hold. I was then taken to medical and cleaned up. My bottom lip was severly split yet I was not given stitches, several bottom teeth were loose as well as a number of scrapes and bruises from being thrown to the ground. Also my wrist were damaged by the cuffs cutting into my flesh. These injuries stayed for 3 weeks

causing pain whenever I tried to talk and especially eat. Because I was in ACU at the time I was only wearing a tissue paper gown when I was assaulted and thrown to the ground while handcuffed behind my back. My knee and hip and elbow was also bruised up pretty good. The officer working the floor at the time COI Clemens stood there not even 3 feet away during the entire incident yet did not come to my aid or tell them to stop. After returning to my cell I asked COI Clemens if she would be a witness for me and she said she didn't want to get envolved period. I was immediatly moved to G-building dorm 4 cell # 2 I believe. I immediatly requested a grievance form and wrote my complaint on 11·6·12 yet it was not filed until the 11·14·12 because I had to wait for the dorm counselor to make his rounds to turn it in. On 12·3·12 the Disciplinary Hearing Officer Meisha Shedrick came to my cell and informed me for the 1st time that I had been written up under false charges of Assaulting a Officer, Failure to Follow and Insubordination by both Anderson and Lt. Moyett. I informed her what really happened and told her that I was never served a copy of any disciplinary report within the 24 hour statue of limitation required by policy. I also told her to ask COI Clemens about what she saw and check the digital camera footage. Obviously this was all a part of the conspiracy to cover for their crimes because I was found guilty of all three charges in my hearing. I appealed the decision to the warden and it too was denied. (see exhibits 8-8) 12, 17 and 18) and 16)

100. On 11·6·12 COI Clemens was working D-West 2 "ACU" and was standing only a few feet away when Anderson attacked me while I was in handcuffs. She then witnessed Lt. Moyett join in and help Anderson slam me to the ground and begin choking me. The entire incident maybe only lasted about 120 seconds but it seemed like an eternity to me while she (COI Clemens) simply stood there in a stuper. After returning to my cell I asked her would she be my witness and she said she did not want to get envolved. The entire incident was captured on Dwest 2 digital camera between 7am-9:00am.

101. On 2·13·13 while being escorted back to my cell by COI Osbourne and COII Taylor I was stabbed in the chest by my cellmate who was a gangmember known for stabbing incidents, after COII Taylor handcuffed him in front against policy. After handcuffing my cellmate in front in order to take him to the shower and return me to my cell from the shower as the door opened and my cellmate walked out he suddenly pounced at me with a knife he had under his wash rag. He was immediately tackled by several officers because the Cert Team was on the floor running yard at the time. I was tackled by Cert Officer Kirkland who punched me in the face at least 6 times breaking my Ray Ban prescription glasses. I was taken to medical by Sgt. Shumate and Cert Officers where my chest wound was cleaned and bandaged. My injury was directly in the center of the chest where the collar bones join not even an inch from my throat. The wound bled for a week before finally developing a scab. I still have the scar to this day. Both officer Osbourne and Taylor gave false

11.

statements to investigators to cover for eachother. Osbourne who was the floor officer standing next to CoII Taylor when he cuffed my cellmate in the front had the nerve to say "He has no memory of the incident" (see exhibit 3-7). Taylor stated that he actually cuffed my cell mate's hands behind his back and told him to step to the back of the cell, he says as the cell door opened he seen my cellmate jump through his cuffs rush out at us and attack me with a knife. For one only a small percentage of people can actually bring their cuffs to the front by stepping behind their restraints and my cell mate was not one of these people due to his short arms and long torso. Secondly had he jumped through the cuffs went and grabbed a knife then ran out towards us it would of activated a defensive response not only in the guards but also in me due to my trauma from being stabbed and paranoid around inmates especially gang members. Although me and that cellmate shared a cell for about a month I did not trust him at all. After I was cleared from medical I was returned to my cell. My cellmate was rewarded by being moved to a better dorm then shortly after that he was transfered to Baldwin State Prison and placed in general population. I was then given another cellmate who was 6ft. four inches tall and about 220 lbs he too was a gangmember.

102. Defendant Brian Owens has been aware of the extremely harsh conditions at GSP since about however long he's been in office since records and reports are submitted to his office on a regular basis as well as letters, grievances and even civil complaints yet conditions seem to be getting worse. Policies directed or mandated by him govern the entire Georgia Department of Corrections and those policies and practices not directed by him must be approved by him in order to be carried out by prison administrations. He has known about the poor conditions at GSP I know since at least Nov.-Dec. 2012 when I filed a civil complaint on him and the administration at GSP. Since then 5% of the close security inmates have been allowed on compound without incident but conditions at GSP have become much harsher.

103. Defendant Robert Toole who not too long ago replaced the old warden of GSP Bruce Chatman, has allowed a few more close security inmates in general population but made conditions for those still in admin/seg. much worse then even the high maximum security facility at Jackson State Prison which is the only max-high max prison in Georgia. Not only are two men sharing a maximum security cell designed for one man cells have been altered and made more restrictive and oppressive. The "word" around the prison is warden Toole is very racist and enjoys making blacks and mexican's suffer. This is said by guards as well as inmates. Warden Toole also encourages guard brutallity and harassment and uses his authority to provoke and oppress inmates. Even now I am being denied showers, yard law library access, supplies, clothes, as well as the right to participate in the Vegan Meal

Program funded by the federal government under the RLUIPA.

104. Defendant Windell Fowler who to my knowledge was demoted to Warden of Care and Treatment from Warden of Security continues to carry out practices that deny inmates basic necessities such as supplies, clothing, living quarters, food service ect. Although I don't know all his responsibilities he is a part of the warden body that controls all functions at GSP.

105. Defendant John Paul who to my knowlege was raised to Warden of Security from Warden of Care and Treatment continues to look the other way while inmates in admin/seg. are forced to share a maximum security cell designed for one man. Even though this policy is extremely harsh & dangerous for the simple fact most inmates on admin/seg. are violent offenders and must live with another violent offender on 24 hour lockdown with no set date of release the whole time being provoked antagonized and abused by guards making them frustrated and volitile with no place to vent but eachother. This policy is like putting two predators in a pit and taunting them and starving them at the same time. Even a blind man can see that this will lead to violence. To this day inmates are still being assaulted by eachother in admin/seg.

106. Defendant Larry Bruton who is the Unit Manager over B-Unit which includes Admin/seg. is very aware of everything that goes on at GSP. He and his wife who is the Unit Manager of A-Unit have been here at GSP well over 15 years and actually have more enfluence of staff due to long standing relationships and other affiliations. He is directly responsible for cell location placement at GSP and can even override classification placement. Even after I personally requested to be isolated from gangmembers due to physical and emotional trauma from being nearly stabbed to death at Baldwin State Prison Oct 18th 2011 he personally made sure every cellmate I recieved was a gangmember. His cruel and deliberate indifference resulted in me being nearly killed by my cellmate on ~~this is~~ 2-13-13 when I was almost stabbed in the throat while in handcuffs.

## EXHAUSTION OF LEGAL REMEDIES

107. Plaintiff Smith used the prisoner grievance procedure avisilible at Georgia State Prison to try and solve these problems. On 6-19-13 plaintiff present a short complaint relating to the facts of this complaint. On 7-8-13 plaintiff Smith recieved a response saying "Your allegation concerning the living quarters, food, medical care and safety are too vague in order to conduct a proper investigation. No further action is warranted at this time". Plaintiff immediatly appeal the response to the warden and gave specific matters into greater detail. He recieved no response. Smiths grievance and response are attached as exhibits (1 and 2.)

108. Although plaintiff appealed he never recieved a copy of his appeal all records are held for two years so all facts in this complaint can be obtained in discovery. Plaintiff has also included a number of exibits.

## LEGAL CLAIMS

109. Plaintiff realleges and incorporates by reference paragraphs 1-109.

110. Defendant Owens by being aware of the extremely harsh and dangerous living conditions and GSP and permitting GSP to continue enforcing policies and practices that have been the direct cause of assaults, stabbings, extortion, robberies, suicide attempts, rapes and even murder as well as encouraging this misconduct of authority at GSP defendant Owens is violating Plaintiff Smith's Eight Amendment rights protected by the United States Constitution, and caused Plaintiff Smith pain, suffering, physical injury and emotional distress.

111. Defendant Toole by not only carrying out policies and practices that are the direct cause of serious injury to inmates by holding two men within a maximum security cell that has been altered and made super maximum by adding steel plates over cell door windows; tray boxes used for food as well as waste, removal of all light switches and electrical sckets as well as toilet buttons, then force these two men to stay in this cell that was designed for one man all day everyday on 24 lockdown without any due process. Not only this but actually making conditions even harsher by allowing guard harassment, abuse and negligence. Defendant Toole is the head warden and any and all institutional practices are directly given by him or authorized by him at GSP. Defendant is dilliberately in violation of Plaintiff Smith's 14th and Eight Amendment rights protected by the United States Constitution and caused Plaintiff Smith pain, suffering, physical injury and emotional distress.

112. Defendant Paul by the authority given him by Warden Toole is continue to carry out these extremely harsh practices and policies directly responsible for the harsh and dangerous living conditions at GSP. Defendant Paul is in violation of Plaintiff's Smith 14th and Eight Amendment rights protected by the United States Constitution and caused Plaintiff Smith pain, suffering, physical injury and emotional distress.

113. Defendant Fowler by the authority given him by Warden Toole is continuing to carry out these extremely harsh practices and policies directly responsible for harsh and dangerous living conditions at GSP. Defendant Fowler is in violation of Plaintiff's Smith 14th and Eight Amendment rights protected by the United States Constitution and caused Plaintiff Smith pain, suffering, physical injury and emotional distress.

114. Defendant Bruton by the authority given him by Warden Toole is continuing to carry out these extremely harsh practices and policies directly responsible for harsh and dangerous living conditions at GSP. Also encouraging a campaign of harassment and abuse by guards to be targeted at Plaintiff Smith. Defendant Bruton is in violation of Plaintiff Smith's 14th and Eight Amendment rights protected by the United States Constitution and caused Plaintiff Smith pain, suffering, physical injury and emotional distress-

115. Defendant Taylor showed deliberate indifference to security measures mandated by policy by handcuffing Plaintiffs cellmate in the front during a adim/seg. cell extraction which allowed Plaintiff to be stabbed in the chest by his cellmate on his way back to his cell from the shower. Defendant Taylors actions violated Plaintiffs Smith's rights under the Eight Amendment of the United States Constitution and caused Plaintiff Smith pain, suffering, physical injury and emotional distress.

116. Defendant Osbourne by witnessing Defendant Taylors illegal action failing to correct that misconduct. Defendant Osbourne who then denied all knowlege of the incident is also in violation to Plaintiff Smith's rights under the Eight Amendment of the United States Constitution and caused Plaintiff Smith pain, suffering, physical and emotional distress.

117. Defendant Clemens by witnessing Defendants Anderson and Moyett's illegal actions failing to correct that misconduct. Defendant Clemens is in violation of Plaintiff Smith's rights under the Eight Amendment of the United States Constitution and caused Plaintiff Smith pain, suffering, physical injury and emotional distress.

118. Defendant Moyett, by witnessing Defendants Andersons illegal actions when he punched Plaintiff in the face while he was handcuffed behind his back, and not acting disruptively, failed to correct that misconduct but instead joined in by choking Plaintiff Smith while he was on the ground bleeding in handcuffs violated Plaintiff Smiths rights under the Eight Amendment of the United States Constitution and caused Plaintiff Smith pain, suffering, physical injury and emotional distress.

119. Defendant Anderson used excessive force against Plaintiff Smith when he punched him in the face while he was in handcuffs behind his back when Plaintiff was not violating any prison rule or being disruptive. Defendant Anderson is in violation of Plaintiff Smith's rights under the Eight Amendment of the United States Constitution and caused Plaintiff Smith pain, suffering, physical injury and emotional distress.

120. Defendant Blakenly used excessive force against Plaintiff Smith when he struck him in the forearm with his handcuffs he took from officer Whitley. Defendant Blakenly is in violation of Plaintiff Smith rights under the Eight Amendment of the United States Constitution and caused Plaintiff Smith pain, suffering, physical injury and emotional distress.

121. Defendant Bishop used excessive force against Plaintiff Smith when he repeatedly slammed Plaintiffs arm in a steel tray flap after provoking Plaintiff Smith into holding his arm out the flap by refusing to feed him or his cellmate. Defendant is in violation of the Plaintiffs rights under the Eight Amendment of the United States Constitution and caused Plaintiff Smith pain, suffering, physical injury and emotional distress.

122. Defendant Tuttle used excessive force against Plaintiff Smith when she struck Plaintiff on the hand with her handcuffs, when Smith was not being disruptive or violating any prison rule. Defendant Tuttle's actions violated Plaintiff Smith's rights under the Eight Amendment of the United States Constitution and caused Plaintiff Smith pain, suffering, physical injury and emotional distress.

123. Defendant Dominguez used excessive force against Plaintiff Smith when he ambushed Smith's cell by saturating the cell with chemical weapons known as "mace" while Smith and his cellmate were showering in retaliation to a rude comment made by the Plaintiff. Defendant Dominguez's actions violated Plaintiff's Smith's rights under the Eight Amendment of the United States Constitution and caused Plaintiff Smith pain, suffering, physical injury and emotional distress.

124. Defendant Jenkins used excessive force against Plaintiff Smith when he snatched the steel phone through the steel tray slot while Plaintiff Smith was attempting to use the phone, crushing his finger in the tray slot. Defendant Jenkins actions violated Plaintiff Smith's rights under the Eight Amendment of the United States Constitution and caused Plaintiff Smith pain, suffering, physical injury and emotional distress.

125. Plaintiff has no plain, adequate or complete remedy at law to redress the wrongs described herein. Plaintiff has been and will continue to be irrepairably injured by the conduct of the defendants unless this court grants the declaratory and injunctive relief which Plaintiff seeks.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully prays that this court enter judgement granting plaintiff:

126. Granting Plaintiff Smith a declaration that the acts and ommissions described herein violate his rights under the Constitution and the laws of the United States, and

127. A preliminary and permanent injunction ordering Defendants to cease their physical violence and harassment toward Plaintiff Smith, also to stop housing two inmates in a maximum security cell on 24 hour lockdown indefinately, and

128. Granting Plaintiff Smith compensatory damages in the amount of $50,000.00 against each defendant, jointly and severally.

129. Plaintiff seeks punitive damages in the amount of $50,000.00 against each defendant jointly and severally.

130. Plaintiff also seeks a jury trial on all issues triable by jury.

131. Plaintiff also seeks recovery of the cost of this suit, and

132. Any additional relief this court deems just, proper, and adequate and equitable.

Dated:

Respectfully Submitted,
Braja Pandit Smith
#953055
Georgia State Prison
2164 Georgia Highway-147
Reidsville, Georgia 30499

## VERIFICATION

I have read the foregoing complaint and hereby verify that the matters alleged therein are true, except as to matters alleged on information and belief, and, as to those, I believe them to be true. I certify under penalty of perjury that the foregoing is true and correct.

Executed at Reidsville Georgia on _____ 20___.

*Braja Smith*
BRAJA SMITH

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a true and correct copy of the within and foregoing Complaint under the Civil Rights Act, 42 U.S.C. § 1983 on the below-named person(s) by placing it in the Prison mailbox in a properly addressed envelope with sufficient first class postage affixed thereto.

This the _____ day of _____, 20 13.   *Braja Smith*
                                                                  pro se

Please Serve:

1.

2.

3.

CERTIFICATE OF SERVICE

This is to certify that I have this day served the opposing party(ies) to this action with a true and correct copy of the within and foregoing Motion For Additional Claims by placing a copy of same in the United States Mail, with adequate postage thereon to ensure prompt delivery, and addressing to:

This 16th day of January, 2013